May it please the Court, my name is Robert Otis, and I represent Appellant Regional Director Overstreet. Our position is that the District Court committed reversible error here, and that a temporary injunction should issue. This is an ancillary injunction proceeding under Section 10L of the National Labor Relations Act. To obtain temporary injunctive relief under this provision, the Director only had to show, one, that there was reasonable cause to believe that the union engaged in an unfair labor practice, and, two, that injunctive relief was just and proper. Well, I don't know if this matters a lot, but that's the first problem is whether that's true or whether Miller is to the contrary. I understand Miller was a 10J case and this is a 10L case, but why should that matter, and didn't Miller say a lot about why it shouldn't matter? No, I don't think it did. I think Miller drew very clear distinctions that the two statutes were not to be dealt with. But it also said quite distinctly that 10L has reasonable cause and that reasonable cause shouldn't be a reason. It's not a court standard. It's an NLRB standard. Right. But it also recognized the mandatory nature of Section 10L rather than the district. Why does that matter? Why does that change our standard? It changes your standard. You have to apply for the injunction, but why does it change our standard? Right. Well, it shows the importance that Congress attached to Section 10L injunctions. It shows that whenever there's reasonable cause, the injunction should issue. But doesn't the statute say that? The statute doesn't say that. The statute. In fact, it's odd. This whole construction issue of 10J v. 10L is really odd because by its plain language – I don't have it. I can't find it right now. But by its plain language, the reasonable cause to believe specifically states the regional director. If he has reasonable cause to believe, then he is required to come to court and seek an injunction. And frankly, I don't understand why courts have imposed that reasonable cause to believe as a standard that applies to them. Well, there are cases. I mean, the Seventh Circuit decision is very confusing on this issue because they say, well, that's not really addressed to us, but we're going to analyze whether he had reasonable cause anyway. And then we're going to also use conditional equitable principles to decide whether issuance of the injunction is just improper. Well, I think what it is, is this circuit has recognized that there is a congressional determination, given the way the statute is written, that whenever there is reasonable cause to believe that an unfair labor practice has occurred, that Congress wants that to be enjoined, given the devastating impact to the interstate, free flow of interstate commerce. I'm having a hard time understanding how we cannot read Miller as having undermined the earlier case law. When Miller says, distinctly, first of all, with respect, there are – what Miller says about the 10J reasonable cause component is, first, it's not in 10J. It was imported from 10L. But second of all, even so, in 10L, the reasonable cause requirement has to do with the Board's own obligation under the Act, not with a constraint on the equitable powers of the district court once its jurisdiction has been properly invoked. So that's an integral component of the reasoning in Miller, and it applies directly here, does it not? But, well, but other – at other points in Miller, and I don't have an exact page cite, they also say that the statutes were meant to be far different. Of course they're different, because one of them is mandatory and one isn't, but that doesn't address the standard. Right. But they say that it – Well, why take the step of requiring the regional director to petition the district court for an injunction? Why not just have the NLRB issue an injunction? Well, I mean, in order to get injunctive relief, you have to go to a federal court. You can't have – And why is that? Even under a Board order under merits, you have to go to a – But why is it you have to go to a court to get injunctive relief? In order to get an enforceable order that can be carried out by the court. Right. But it's because the district court will apply – will independently consider the issues and the equitable principles and apply its judgment. Right. If – if – Counsel, let's suppose that Miller does apply both to J and L. Does – is that outcome determinative? No, it's not, Your Honor. You need to make a stand on distinguishing Miller? No. I mean, again, I – the position is that Miller clearly applies to Section 10J, not to 10L, and in Miller, they say that whenever – and 10L shows that whenever they wanted to impose a reasonable cause requirement, Congress did impose that requirement in the statutory language. But the two standards are fairly similar, even under the likelihood of success under the traditional – What you were just saying was about why we should distinguish Miller. That's right. But I ask a different question. I'm sorry. Let's say you lose on that. Does it matter to your case? No. I think an injunction is still issue here. Is that – if I understand you correctly, Your Honor, an injunction, even if you apply the traditional four-part equity, which, again, I don't think should be used as an injunction I think under Miller, irreparable injury is presumed. Is that right? Right. Well, if you establish the likelihood of success, of course. Right. And the likelihood of success prong is almost directly analogous to the reasonable cause prong. You only need to come forth with a better-than-negligible chance of success and some evidence to support that. It has to be non-frivolous. But, frankly, I'd like to get off Miller. Excuse me, Your Honor. That's not my understanding of Miller either. I thought Miller said that if you have only that much of a standing, you do need a reparable – a showing of irreparable harm. You only presume irreparable harm if you show a natural probability of success on the merits. But I'd really rather get to the merits of the case than our – Right. Well, here the evidence is undisputed, isn't it? Pretty much. Let me ask you something to make sure I've got it right. Sure. I want to make sure I understand the evidence. You don't have pickets carrying signs. Instead, you have stationary signs. A large banner, yes. But it is not merely a communication by the written banner. You also have pickets who stand there. Is that correct? Yes. I mean, you have – you have people holding up the banner. You have people holding the banner. Excuse me? You have people holding the banner. Yes. Two or more union agents holding the banner. I do have people, and someone who wants to enter the premises knows that he will be spotted by the people. You clearly have a union presence there, a physical presence there. How close are they to the entrance? What is the distance from the entrance? It varies from site to site. For example, at Anthony's Fish Grotto, they were almost right up against the door. I believe it was some 20 feet, if you see the picture. That is the closest one, I think. I believe it is. It's Supplemental Exception of the Record, page 65. And in other instances, they were hundreds of feet from the door. Only in some of them. At Hyatt, you have a banner on the grass island right outside the front door of the hotel. At Artisan Homes, you have them 20 feet away from the driveway entrance that led to the construction site and to the sales office. At Harkins, you have them 20 feet away from the drop-off zone outside of the 19th Avenue Theater. What I'm thinking about here is some unions have rules that if you cross a picket line, you're subject to union discipline. Right. And it really matters whether anyone can see you doing it. And a lot of people don't like to cross picket lines, even if they're not subject to union rules. And it's altogether different just receiving a communication, like if you read it in the paper. Right. Or a handle, for that matter, yes. And walking past people who are standing like sentries. And I'm trying to figure out which it is here. And it looks like it's both. No, I mean, number one, given this isn't a case on the merits, again, under either standard, the Director only had to come forth with a better than negligible. Wait a minute. This is a case which certainly has a – which you're asking us to enjoin something. Yes. Which is at least arguably, and perhaps more than arguably, First Amendment protected. Is that not right? No, that's not correct at all. And it's not arguably protected? There isn't a strong constitutional argument or a constitutional argument of some weight that this is constitutionally protected? I mean, we – the Director's position here is that, one, if this is picketing, it's secondary picketing. So the argument is that first we decide if it's picketing, and if it's picketing, it is not protected by the First Amendment. That's correct. So it's a verbal argument. If you can label it as picketing, then it's not protected as the First Amendment. If it's picketing, it's not – it's clearly not protected by the First Amendment. And if it's fraudulent languages to the second theory, it's also defamatory, not protected. But picketing is – this is where I just want to clarify this. Sure. Okay. So the evidence is undisputed. So what we're really doing is looking at it as a question of law. Is this closer to De Martello, or is it closer to picketing? Right. So that's a question of law for us to decide. And you can't say – I mean, it's hard for me to say, well, this is what I think the correct law is, but I'm going to imply that it's reasonably probable that this is the correct law. Well, that's – it's not a final case on the merits. It may come back before the circuit after the Board has ruled on it. We only need to show reasonable cause or, if you disagree with that, likelihood of success on the merits. Suppose this was the Sierra Club standing up there with a sign saying, you know, environmental villain. Do you think you could go to a district court and get that enjoined? I have no idea. I'm dealing with a strict labor case here. Well, but that's the problem, because there's a very strong First Amendment issue here which cuts beyond a strict labor case, as De Martello recognized. And the question is whether the Labor Board has recognized it, either in coming here for an injunction or in asking us to issue an injunction. Your Honor, it's on question here. Had they been using ticket signs, this would have been a clear violation under the Act. The fact that they had a banner doesn't change – excuse me. Most of the cases that – it is true that the cases which try to explain why picketing is conduct are opaque. But they certainly say somewhat consistently that the patrolling nature of the – I'm talking about the – not the Board cases, but the court cases. And I – and especially the court cases that address any constitutional issue. Your Honor, under well-established board law, I guess is my answer here, you don't need patrolling in order to find – I understand that. But the Board is not taking into account constitutional issues, which is why in Bartolo the Board's view was totally ignored. Your Honor, the necessary element here is really a confrontation. You're keeping people away. To put it in Justice Stevens' terms, from retail store employees, it's the automatic response to a signal. This is not people reasonably responding to a signal. It's a persuasive idea. And what if they put a bill for it saying the same thing? That's a totally different case, Your Honor. It's no union presence. I can't help but think that it's a – Excuse me, Your Honor, I didn't hear you as you started. I can't help but think that it's a little bit different, that the old and traditional Supreme Court emphasis on preserving labor peace is at the heart of it. And traditionally, labor law runs roughshod over a whole lot of free speech rights that would prevail in other contexts. Like an employer can't say, I will shut the place down if the union wins the election, even though that is, in fact, true, and it is a communication that would be very valuable to the employees to receive. That's – yeah, you're right. And you can't put it in the newspaper. Right. It's not just a matter of not being able to say it at the workplace. And the only way I can rationalize the whole body of decisions is that there's a limitation on free speech to preserve labor peace in this body of law. And that's definitely correct, Your Honor. That's the whole issue of secondary boycotts is that it's been recognized consensually by the Supreme Court that you can regulate secondary picketing because even though it imposes somewhat an infringement on First Amendment rights, you're supposed to keep a neutral employer out of a dispute that does not involve its own – that doesn't have anything to do with its own employee needs. Help me to understand the precise conduct that you believe falls within the rubric of confrontation. Right. Well, I think there's several factors there. Number one, these banners are highly visible. I mean, they're a clear keep-away signal. Even at the Anthony's Fish Brother, you have a do-not-patronize message on that banner. It says, do not eat here. Number one, people have to – people are automatically confronted with that. They have to respond to that and make up their minds very quickly as to where they – whether they patronize the establishment or not. Second thing is they're stationed very near some of these facilities, the front entrances. Again, it creates that confrontational keep-away element. But not the ones where they're not very close. It's still – I mean, the union concedes that they put these banners in very visible areas. People approaching these facilities still have to cross these banners. If it was banners without people, would it then be a different case? Again, Your Honor, I – that's not the case here. And – Well, it sort of is the case where the people are too far away to recognize somebody. And it sort of isn't the case where the people are standing right at the door. I mean, at all of these – at all of these facilities, you still have a physical presence regardless of where they are. And people have to cross that line. Well, you're putting it kind of abstractly, a physical presence, but it's not a question of physics. It's a question of whether somebody who would like to cross the line feels like it's not wise to cross the line because of the people who are standing there watching. Right. Again, at every one of these facilities, you have several – two or more agents holding up the banner. And it creates that confrontational – Are they doing anything else? I'm sorry. I'm sorry. So that's the crux of this, is just the mere presence of the agent? No. It's really four factors, Your Honor. You have a large banner that's – as the ALJ, just to show how reasonable the Director's position here, the ALJ found picketing in the underlying merits case, said, you know, it's a large banner, number one. It's a visual message, comprehensible at a glance of a labor dispute. Number two, you have a physical presence there. Number three, you're located near many of these places, the entrances to these facilities. Number four – And not in other places. Excuse me? And not in other places. Not in other places. I mean, but still, again, it approaches where they're highly visible. They're still close to these – Sometimes only by car, right? Right. Sometimes only by car. And the fourth element is that you have them declaring a secondary labor dispute and then only naming the neutral employer they're standing near. It's painting the neutral employers as the bad guys here. And they have no dispute with these neutral employers. Your Honor, I'd like to reserve the remainder of my time for rebuttal unless you have more questions. Well, I guess question remuteness. Is this case moot because none of the signs are up anymore? No, not at all. The union here has shown its proclivity to continue engaging in this. It gave its assurances in October 2002. And then – So it's capable of repetition, so it takes it out of that? Certainly, Your Honor. What about – what is the impact of the ALJ decision? Well, the ALJ lends support and shows just how reasonable the Director's theory is here. It shows that he has satisfied his minimal burden for a preliminary injunction. And procedurally now, is there an appeal from that? Yes. That is the merits case, and it is not on appeal to the Board. Okay. And from there, it would go back here? Eventually. If it got to that point, yes, it would come back here on the merits. All right. Thanks. Thank you. Good afternoon to the Court. Gerald Selvo on behalf of the appellees. To start with this case, obviously the facts are well established. Very large banners with a message. And in most cases, the message is simply shame. In the one case of Anthony's, the message was different. There may have been one or two other little cases that were slightly different. In this case, there is absolutely no – I shouldn't say absolutely no, but basically there is no evidence of any impact on any neutral employees whatsoever. There's no evidence what – at all. And this goes to Justice Kleinfeld's question about whether people might be concerned about crossing because they'd be seen. There's absolutely no evidence of that in this case. There's no – Did the signs also say that they weren't being directed and asking anybody not to work? No. The signs, all they have on them is basically shame on the name of the secondary and the words labor dispute. There is no evidence in this case of any recordkeeping by any of the – Wait. The potential supplier or repair person or customer or whatever doesn't know what kind of recordkeeping is being done. The only way he can be sure that he can cross this picket line safely is if everybody or whatever you call it, is if all the people who are standing there near the banners have red and white canes and seeing eye dogs. Well, there's a pretty well established – You mean the eyes or what's coercive? There's a pretty well established doctrine or set of rules that relate to what you're talking about. And that is the signal picketing aspect of cases. And the general counsel here has argued this is signal picketing. But the problem with the argument is, is there's no support in the facts part. These banners were not posted at any locations where the employees of the neutrals would cross. There's no evidence of that. The only evidence in the case is that they were posted out where the public would see them. So that concerns me a little bit because if the assertion or if the thinking is that you can't publicize your message, which is a message – It's not the seeing that concerns me. It's the being seen. The communication is letting the public see it. The coercion is the being seen. That was addressed by the 11th Circuit when the case came up the second time. Basically, the argument that the G.C. made was the mere – The case. Bartolo? B. Bartolo, yes. I'm sorry. What the G.C. said was, well, the presence of the people there is coercive. And what the 11th Circuit says, you have to – basically, you – what they said was there is no evidence in this case of harassment or patrolling or anything else. And the argument that we make in that context is that it takes people to convey a message. And, for example, take the situation in D. Bartolo itself. Well, in D. Bartolo, they needed people to hand out the handbills. But here they don't need people. They've got the communication erected on a banner. Well, Your Honor, it's not a matter of record in this case. But you cannot leave banners out on sidewalks and on streets like that. Is there a law on that? Yes, there is in many cases. And that's why the people are – because my – one of my big issues with your position is why do you have the people there if not to threaten, coerce, or restrain? Well, the people are there to hold up the banner. That's – again, I'm having to go outside the record here. And it seems to me that that's beneficial. You can't post that under some city laws or ordinances. That's correct. In fact, there – That's not outside the record because we can, of course, read the law if there's some law on that. Well, yeah, there's lots of sign ordinances. There's lots of sign ordinances that talk about you can't have these – it would appear that you can't have them at all. Again, I have to go outside the record. And this is not a part of the record. But there have been innumerable cases where there's been dealings with municipal authorities about these banners and the size of the banners and where you can put them up and things of that nature. That's why there are – and there's another factor, and that's when they're left alone, they get destroyed. So the people are there to protect the banner and to hold the banner up so it's in accordance with local law and to help communicate the message. What message are they helping to communicate? The message – the only message that they communicate, and I think the record just shows this, is that there is an explanation, a handle of why the bannering is going on. And by the way, I think it's important here to point out that there is a dispute with the neutral. The dispute with the neutral is that we don't like the way that you do business. We want a fair contracting policy. We want you to utilize contractors who meet area labor standards. It's basically the state prevailing wage law, except that the union wants to have it extended to private contractors, and that's the message that's being delivered. If you were to distinguish the cases which have picketing in the traditional sense from this for purposes either of First Amendment protection or labor statute, what differences would you point to and why should they matter? I guess what I'm really asking is what is picketing that this isn't? We have gone to fairly great lengths to present some of the factual situations in the cases that are urged as showing that confrontation is not required. And in fact, all of those cases involve classical picketing in the sense that people are patrolling across the entrance and actually intercepting people. So one of the classic picketing is a line going of several people going back and forth in front of an entrance, essentially doing what? I mean, what's the message that's being conveyed? The message is the very word, picket, I believe, suggests that it's almost a military maneuver. You are going to have to encounter me and cross me, and it's going to be a physical. It's like there's a fence in front of the entrance. It's a physical encounter. It's going to be a physical encounter. And in this case, in all cases, the banners were 20 feet or more away from an entrance, except with the case of Anthony's was mentioned. And that's, of course, a unique situation, which is on the waterfront there in San Diego. And there's no other place to put the banner. And even from the supplemental excerpts of record, you can see that it was placed in such a way that no one had to run the gauntlet of the banner to go into the hotel. And in some of the places, what's the variability? In some places, you're quite far away from the entrance and not – and only visible to cars? Well, I think in all cases, you would be – the banners would have been visible to any pedestrians that were in the area. But the locations where these banners were posted were places that were basically accessed by vehicles. They were like, in some cases, business parks, something of that nature, where you don't expect – it's not like a downtown where you expect a whole lot of pedestrian traffic because the distances involved are so great. Distances interest me here. 20 feet, you can recognize people. I'm looking around the courtroom here, and I can recognize faces beyond 20 feet. A hundred feet, it's really pushing it to recognize people. Some people can. I can't. I'd like to talk to that particular distinction. Again, that goes to the signal picketing doctrine that the Labor Board has advanced in many cases. That doctrine is limited to employees of neutrals. And I think we've cited a number of cases where if the banners are not posted or the pickets, if you will, because area standards picketing are allowed, and even consumer picketing is allowed at the locations of secondary employers. But what the board looks to is where did you put the banners? Who did you seek to address with the banners? And they don't look at it in terms of the general public. They look at it, did you put the banners at the entrances that are used by employees? Did you put them there when the only people or most of the people that are going to encounter them are employees of the neutrals? None of that exists in this case. It's clear that the banners, the facts show, the evidence shows that the banners were posted for the greatest public visibility. And to go back to the point I tried to make a moment earlier, there is a dispute with the neutral. It's the area standards dispute. And notwithstanding your observations concerning labor law, that somehow or other it seems that speech sometimes doesn't have quite as great a range in the labor area as it does in other areas. It just seems that way to employers when they can't tell the truth. You're absolutely correct. But, you know, what this is about in this case is a political issue. The political issue of area standards, prevailing wage. It's not a subject of should you have a union or not. And so that distinguishes it from the normal kind of case where constraint happens. Still, the way you get to what's good for the goose is good for the gander in this area is that the board's overall objective is to preserve labor peace. Because of the importance of that objective, the traditional view required of the lower federal courts is deference toward the board and enforcement of the orders on a very liberal standard, even if the court would reach a different result itself. That doesn't apply in this case. Indeed, Bartolo says that very specifically, that they don't give deference to the board in the area of First Amendment rights. That's exactly what Lee Bartolo said. And I think it is somewhat of a chicken and egg argument, but the difficulty with the general counsel's case is that they can't really – it's kind of a frightening notion that any time you publish your position on an issue of – on a public issue, then – I don't know. And someone might take that issue, you know, accept your point of view. Gee, I'm not going to patronize this particular employer because I don't like their contracting standards, that therefore it's fraudulent and therefore it can be enjoined. I think it's quite a frightening concept. And I don't think there's any basis in – really any basis, substantial basis in law for that notion. So how would you think in terms of our immediate task, which is determining the propriety of an injunction at this point, do you regard the First Amendment background or possible First Amendment violation as impacting on the injunctive standard? In other words, what is it we're doing here now? Yes. Yes, I do. Nowhere – nowhere in any of the general counsel's papers is there any reference to the statement by the Supreme Court that 8b-4 is not – is to be interpreted with caution and it's not to be given a broad sweep. When that's combined with – Particularly to avoid First Amendment. Because of First – not in general. Not if somebody was striking, for example. But when you're talking about a First Amendment issue. I would say that it's long past the day when we could argue that classical picketing would not be restrained from coercion within the meaning of 8b-4. Or striking. So when you're talking about narrowly interpreting 8b-4, you're only talking about in the face of a credible First Amendment argument. That's correct. And the Supreme Court has said, don't give the Board any deference in this area. And I think that is really the standard that has to prevail in the context of whether or not there's reasonable cause to believe that the Act has been violated and whether the general counsel has carried its burden here. And I think the answer is this Court gets to examine de novo entirely whether the general counsel's reasoning is correct. Is correct or is arguably correct? I'm just sort of looking for one position. I think it's whether it's correct in light of the Catholic bishop rule, which there is a substantial First Amendment issue here. And we will not interpret the statute to cover this conduct unless it's absolutely clear from the legislative history that that's necessary. I think that's all that Di Partolo does, and that you're over-reading it by saying that it means no deference where First Amendment is involved. I think all it really does is say that you apply the Catholic bishop's rule and read the statute to avoid First Amendment issues where possible. Well, I think that the Supreme Court actually addressed the deference that's to be given to the Board in this kind of a case, Indy Bartolo, and they said they actually have comments in there. Normally we do give the Board substantial deference, but not in the area of the First Amendment. That's actually a part of the Di Bartolo decision. They specifically say we will not give the Board deference in this context. To go back to this distinction between entrances and being at a distance, on the facts of this case, are there any of these banners that were actually in front of the entrance where the employees had to pass? No, there were no banners. The Anthony's Fish Grotto was mentioned. The banner there was actually against the building. So there was, there's like a walkway, a wide walkway with a number of shops, and then, okay, well, I think the supplemental excerpts of records show. From the pictures, it seems as though, well, I guess what I'm trying to ask is do we need to analyze each instance of bannering separately to see whether the situation arises to the level of confrontation? I guardedly would answer that question to some limited degree. But I think the only, you know, really the only case that really raises that issue, and this is in the context of an injunction, obviously, so in a First Amendment case, so I would urge that the Board's position not be taken as, given substantial weight simply because it's coming from the Board. As we've said, the administrative law judge's position was that if the banner could be seen at all, it was pickety. And if you, in that... And the ALJ went further than the General Counsel. Yes, the General Counsel withdrew allegations that banners that were three miles away from the job site, and, you know, some distance less than that, but still a tremendous distance, violated the Act. But the ALJ went ahead and said they did anyway. And, you know, our criticism of the ALJ's decision is that she used Board law that was decided basically before de Bartolo and said, well, this is different than de Bartolo, which is limited only to handbills, and therefore it doesn't apply. And she made no mention of the Catholic bishop doctrine at all. I guess the real question is a real simple one, and that is, do you apply the general law in picketing, which is issue the injunction, or the general law in handbills, which is don't? And here, it's obviously in the middle. And what you're saying is, don't defer because it's like handbilling. And the Board is saying do defer because we're saying it's like picketing. And it seems kind of circular to say don't defer or do defer based on whether it's like one or the other, where first we have to decide whether it's like one or the other. Well, and I think that goes to what distinguishes picketing from non-picketing activity. And I think you have to go to You need an element of physical oppression, if I can use that term, physical oppression. That's the classic. I don't know about that. Some people don't want to cross a picket line because they're afraid somebody will hit them or there'll be violence. But a lot of people don't want to cross a picket line because they fear they will be seen or they fear they will be subject to labor discipline or they believe in supporting the labor side of a labor dispute and they don't want to act in a way contrary to a union's interest. And for all those reasons, it looks a lot like picketing. You've got people there with the signs close enough to see what you do. I would urge to Your Honor that it should not be judged by what some uncertain people might do. There is no evidence in this case that anyone didn't cross the picket lines. There is no evidence. The real problem here with the verbiage cross the picket line. I'm sorry. I understand your argument is basically nobody had to cross anything. Right. That's correct. That's correct. There was no If there's a distinction, that has to be it, that there was no gauntlet to be run. That's absolutely the case. And the evidence indicates that these banners were posted for particularly that person, that way, in a disciplined, stationary fashion. Let me ask about the Nobody walking and nobody in front of any entrance. That's correct. The banner bearers were stationary with handles. I have two questions about that. One is about the verbal content of the banner and the other is about the people holding it being stationary. On the verbal content, I look at these banners and they have very few words. Shame on Hyatt. Labor dispute. Labor dispute. Shame on Artisan Homes Inc. Labor dispute. The reasonable way to understand that communication would be that the union holding up the banners or the people holding up the banners have a labor dispute with Artisan Homes, Hyatt, and the various other firms that are involved. That they have a dispute with a third party and not Hyatt or Artisan would not be a reasonable inference from the banners. Am I missing something there? The only thing I would say you're missing, Your Honor, is the definition of labor dispute in the Act and in the Norris LaGuardia Act. And the definition of labor dispute encompasses secondaries. There's been an entire legislative reaction to a court restriction and it's very clear that labor dispute includes the secondary employers. Absolutely clear. I mean, that's the definition of a labor dispute. It's the only definition around. So what you're saying is they're not misleading. They're true. This is a labor dispute with a secondary. That's correct. And now my second question on the stationary part. The way I remember it from the 60s when some of us used to sometimes demonstrate was you couldn't stand still. You had to walk because if you stood still the police would say move along. But if you were walking you could just say I'm just walking down the sidewalk. Everybody has a right to walk down the sidewalk. And that they'd say that's right and leave you alone. So I thought the reason that pickets walked was because as long as you're walking down the sidewalk the no camping no loitering ordinances that then used to be in effect would not be a bar to the activity. Standing if anything seems more rather than less intimidating if the location is the same. Given the same location standing like sentries well the simile itself answers the question I guess. Why wouldn't standing be worse than walking rather than better than walking for purposes of deciding whether it's coercive? Normally the issue of standing or walking arises when you actually have pickets who are patrolling across an entrance. I mean that's what I when you say that's where I've encountered it in the context of temporary restraining orders that people cannot walk across the entrance so as to block traffic which you know goes to the patrolling aspect of it. As for the greater or larger question that you asked this is a protected activity under the National Labor Relations Act. It's engaged in by labor organization for the benefit of the labor organization. There's no inherent evil to it. It's not like dynamiting someplace or something of that nature. So it's a protected activity and because it's protected by the National Labor Relations Act hopefully the National   by the National Labor Relations Act. It's a secondary boycott. So that's No. If it is a secondary boycott it's not protected. Putting that aside which is the issue. There's no other reason why it wouldn't be protected. There's nothing inherently bad about it. So the kind of laws that you may be talking about which I was suggesting is the custom of walking rather than standing still grew out of those laws no longer in effect against loitering. That's correct. That would be my opinion. Actually I would like to read a writer on the history of picketing and I've read a lot   picketing and I don't know if there's a complete story but I think part of the reason may be to sort of convey a cordon sanitaire as if there are more people there than are actually there. In other words what you're doing is you're drawing almost a visual fence in front of an entrance and to do that you have to keep circling because if you just have three people standing there then you obviously don't have a solid barrier. It's a symbolic barrier. One thing that occurred to me while I was sitting here was in temporary restraining orders where there's no confrontation and once that's done then there's no problem with the confrontation. So it seems to me that that supports the view here that when you have someone 20 feet away from an entrance that you don't have any confrontation. In fact there's a law in Nevada which I don't think would withstand scrutiny which purports to limit every union picket line to certain like three people stationed in a certain location. I don't think it would ever withstand scrutiny today. But there is such a law in Nevada. I see I've gone way over my time. I would point out that we did submit a 28-J notice. Judge Feast in the Central District you don't waive anything you know. We've got Thank you. Thank you counsel. Counsel I believe you reserved some time. Your Honor the person Are you acquainted with the I think three Supreme Court cases dealing with abortion demonstrations in front of abortion clinics? I'm sorry Your Honor I'm not very familiar with those cases. The first thing I wanted to address was there was this discussion here about the local ordinances and what's going on. The injunction here would not preclude the union from getting its message out. It can still hand bill these facilities. Clearly that's protected activity. It can still engage in primary picketing where the primary employers are located. It can still get its message out. There is nothing here that's precluding it from getting its message out. They are hand billing at these facilities, right? And we are not attacking that. Okay. So what they're doing with the signs essentially is attracting attention so somebody might come over and get the hand bill. Otherwise how is that going to make another there with the hand bills? Number one, as far as the hand billing goes, they concede in their brief that they're not actively trying to distribute the hand bills. Someone has to come up and ask for it. The second thing is that's what picketing is. It's a signal. It's stay away, keep away. Right. The one I just described isn't keep away or stay away. It's come over here and we'll give you some information. That's not do not patronize. It's not come over here and I think  not that's not correct.   between the hand bill and the picket. There's a difference between the picket and the hand bill. And the hand bill would be fine. Same words? I'm not sure about that. I can't speak to that. Again, the Bartolo was truthful hand billing. It's not leaving out the truthfulness. If it was a truthful hand bill, of course they can handle it. Suppose the sign said what you wanted it to say. The sign said we have a secondary dispute with Anthony's fish grotto instead of a labor dispute. You can have the same thing on the sign and on the hand bill. That's correct. A hand bill would be protected and a sign wouldn't be. It's the same thing if you had a picket legend. And if you had a hand bill. I don't find that useful. That's conclusory. Argument by labeling is not helpful. I'm sorry, Your Honor. I'm just saying that if you had a picket sign that said what the hand bill said, that would clearly be a violation. If you had a picket sign out there and then you also had a hand bill that said the same thing, you're going to find a violation of that situation. The fact that this is somewhat larger than a
judges: Kleinfeld, Wardlaw, Berzon